**Leonard H. LUNDBERG, Petitioner-Appellant,**

v.

**Raymond J. BUCHKOE, Warden, Respondent-Appellee.**

**No. 15576.**

United States Court of Appeals Sixth Circuit.

Nov. 9, 1964.

Thomas D. Heekin, Cincinnati, Ohio, for appellant.

James R. Ramsey, Lansing, Mich., Frank J. Kelley, Atty. Gen., Robert A. Derengoski, Sol. Gen., and Donald T. Kane, Asst. Atty. Gen., Lansing, Mich., on the brief for appellee.

Before WEICK, Chief Judge, and CECIL and PHILLIPS, Circuit Judges.

HARRY PHILLIPS, Circuit Judge.

Petitioner Lundberg, who is serving a life sentence for first degree murder in the Michigan state prison at Marquette, has appealed from the order of the District Court denying his application for writ of habeas corpus.

The victim of the murder was Patricia Burdick, a twenty-one year old school teacher in the public school at Grand Marais, Michigan. On Sunday April 22, 1956, Miss Burdick was en route from her home in Sault Ste. Marie to Grand Marais for the purpose of being at her school the following morning. For an unexplained reason she found it necessary to hitchhike. She had ridden with friends from her home to a highway intersection in Schoolcraft County, Michigan. At 8:00 p. m. she undertook to obtain a ride north on highway M-77 to Grand Marais. A husband and wife stopped and offered her a ride, but she declined because they were going only part of the way to her destination. There is no evidence that she was seen alive after this time by any person other than Lundberg.

When the teacher failed to appear at her school on Monday morning, a missing person report was made. At 4:30 p. m. on Monday Sergeant Anthony F. Spratto and Corporal Ray Zeni of the Michigan State Police began an investi-

gation. After interviewing the persons with whom the missing teacher had ridden from her home and the couple who had offered her a ride part of the way to her destination, the officers made a check Tuesday April 24 on parolees in the area. They found that Lundberg, a parolee, was staying at the Bellevue Hotel at Munising, and had been last seen by the hotel proprietor about midnight on Sunday April 22, when he came to the hotel, went to his room, and returned wearing a pair of coveralls.

On Wednesday April 25 the officers learned that Lundberg had come to the parole office in Marquette and requested permission to go to Detroit. About 10:00 a. m. on Wednesday they located Lundberg's 1949 Dodge automobile parked on a Marquette street. They saw blood on the right front window, on the right front door, on the right side of the dashboard and on the right side of the front seat, and noticed that the floor mats were missing. At 10:30 a. m. the officers received notice that Lundberg was at the Marquette city police station.

The two police officers picked up Lundberg at the police station and took him to the Michigan state police headquarters at Marquette for questioning, informing him that they were investigating the disappearance of a missing school teacher and that he was a suspect. The officers testified they advised Lundberg at that time of his constitutional rights and warned him that anything he said might be used against him. At first Lundberg denied any connection with the missing teacher. Initially he explained the presence of blood on his automobile by saying that he hit a deer and tried to load it in the front seat of the car. When confronted with the fact the blood was human blood, he said he hit his nose on the steering wheel when he struck the deer, and his nose had started to bleed. Next he explained the presence of human blood by saying that he had performed an abortion on a girl friend the previous Saturday night. He claimed that the floor mats were thrown into the city dump in Munising.

At 4:15 p. m. on Wednesday April 25 the officers drove petitioner approximately forty-four miles from Marquette to Munising and made an unsuccessful search for the floor mats. Lundberg was then placed in the Alger County Jail while the two officers interviewed the woman upon whom Lundberg claimed to have performed the abortion, obtaining a written signed statement from her to the effect that no abortion had been performed and that she was sterile as the result of an earlier operation.

Later that evening Lundberg was taken back to state police headquarters at Marquette and the questioning was continued. At 8:25 p. m. Lundberg told the officers that he would tell them "what they wanted to know" and started to draw a map. The officers stopped him from drawing the map and told him that he would have to accompany them wherever it was they had to go. Lundberg said: "Sergeant, if you promise I don't have to look at her I will go along" and this promise was made. Lundberg then guided the officers thirty-two miles to a point in the vicinity of Autrain, Michigan, where the floor mats and a pink sweater, both stained with blood, were recovered about 10:30 p. m. Lundberg then told the officers that they would have to go north of Seney on route M-77. At this point the officers radioed state police headquarters at Marquette and requested that the coroner and prosecutor for Alger County be contacted, upon the belief that the body would be found in Alger County. The officers and Lundberg then continued some forty-eight miles to the intersection of routes M-28 and M-77, then drove, at the direction of Lundberg, five and one half-miles on a sand road, where the body of Miss Burdick was found about 11:00 p. m. The coroner of Alger County examined the body and ordered it removed to Munising.

After the body was located, Lundberg told the officers that he had picked up Miss Burdick about 8:30 p. m. on Sunday April 22; that he had pulled his car off on a sand road and started to kiss the girl and placed his hand on her leg;

and thereupon she began to scream that he was not going to rape her. Lundberg stated to the officers that at this point he had to do something because if Miss Burdick should report a rape attempt, he faced fifteen more years in prison as a parole violator. He confessed that he killed the girl by beating her over the head with a fourteen inch open end crescent wrench. At first he said he did not recall how he got possession of the wrench. At one time he stated that he reached under the seat for the wrench. At another time he stated that he had grabbed it from Miss Burdick who had first picked it up and struck him on the chest. An examination of his chest revealed no bruise or other trace of such a blow, at the time he made this statement.

It was about 1:00 a. m. when the officers left the site where the body was found. In the interim they had radioed for a map, in order to determine for certain whether the crime had been committed in Schoolcraft County or Alger County, and determined that it had occurred near the county line in Schoolcraft County. Lundberg then was driven approximately fifty miles to Manistique, Michigan, where he was interrogated for fifteen or twenty minutes at the county jail by W. J. Sheahan, the prosecutor for Schoolcraft County, beginning at approximately 2:15. The prosecutor questioned Lundberg as to whether he had been coerced by the officers, and Lundberg stated that no threats, promises or inducements had been made. The prosecutor explained to him his constitutional rights against self incrimination and told him that he was under suspicion of murder and that anything he might say could be used against him. Lundberg stated he voluntarily would relate what had happened and proceeded to tell prosecutor Sheahan substantially the same story he had told the two officers while in the police car. Lundberg then was turned over to the Sheriff of Schoolcraft County, and spent the remainder of the night in jail.

At 9:15 to 9:30 the following morning Thursday April 26, Lundberg was taken to the office of prosecutor Sheahan for further interrogation. He repeated his story of the previous night to Sheahan in the presence of the officers. At sometime between 9:15 and 10:00 a. m., while in the prosecutor's office, Lundberg prepared a written statement in his own handwriting. This statement reaffirmed much of the story that first had been told to the officers, but was silent on the question of his reason for striking Miss Burdick except that she screamed that he was not going to rape her and had picked up the wrench and had struck at him. (This written statement was not entered in evidence by the prosecution, but was introduced as defense evidence by Lundberg's attorney at the state court trial in an effort to establish absence of premeditation.)

About 10:00 a. m. Lundberg was returned to the Schoolcraft County jail and the officers went to the funeral home where the body had been taken and where on the same day an autopsy was performed. At 3:00 or 3:30 p. m. that afternoon, Thursday April 26, the two officers picked up Lundberg at the county jail and took him before a justice of the peace in the Manistique City Hall, where the complaint and warrant were read to him. Lundberg was not represented by counsel at this time but no contention is made that any of his constitutional rights were waived or violated by the fact that he had no lawyer to represent him at this hearing. The prosecutor explained to him his statutory right to a preliminary examination and that under such an examination it was necessary for the prosecution to show probable cause for the court to believe he was guilty as charged, or he would then be dismissed, and that he had the right to make the prosecution produce witnesses giving evidence against him. Lundberg interrupted the prosecutor twice, saying that he knew what the law was, but the prosecutor continued on the subject to explain his rights. Lundberg waived

preliminary examination and was returned to the county jail.

The trial of Lundberg took place on June 18 and 19, 1956. He was represented by Gottfrid S. Johnson, an experienced local attorney appointed by the court. Lundberg signed a statement in open court waiving trial by jury and was tried before Circuit Judge Richard W. Nebel. The state offered evidence establishing the corpus delicti and proving Schoolcraft County to be the situs of the crime. The pathologist who performed the autopsy testified that Miss Burdick's blood was type A, the same type as the blood found on and in Lundberg's automobile, that she died of multiple blows on the back of her head, and that his examination of her body revealed no evidence of sexual violation.

Two experts from the state crime detection laboratory testified that an examination of the clothes worn by Miss Burdick revealed that several articles were stained with type A human blood; that the pink sweater divulged by Lundberg was stained by the same type of blood; that the seat cushion and seat cover of Lundberg's automobile were stained with the same type blood, as were the floor mats that had been removed; a pair of Lundberg's trousers were stained with type A human blood and a pair of his shoes were stained with blood which could not be typed because the shoes had been soaked in water; that nothing was found on Miss Burdick's clothing which could be attributed to Lundberg; and that fibers which could have come from the victim's coat were found on a pair of Lundberg's trousers and similar fibers were found on the floor mats.

The two officers testified as to the oral confessions made to them by Lundberg. No objections as to the admission of these confessions were made by Lundberg or his counsel. Lundberg's attorney contended that the crime, if committed at all, took place in Alger County; and that Lundberg did not strike Miss Burdick until after she had hit him with the wrench and there was no premedita-

tion. Lundberg's written confession was introduced as defense evidence in an effort to establish the absence of premeditation.

At the conclusion of the trial, the Court found Lundberg guilty of the wilful, deliberate and premeditated murder of Patricia Burdick and sentenced him to the state prison for life.

On December 21, 1960, Lundberg perfected a delayed appeal to the Supreme Court of Michigan, which affirmed the conviction. People v. Lundberg, 364 Mich. 596, 111 N.W.2d 809 (1961). The principal contentions of Lundberg before the Supreme Court of Michigan were the improper use at his trial of involuntary confessions made by him during a period of illegal detention; that the voluntariness of his confessions was not established at his trial as required by Michigan case law and that his conviction of murder in the first degree was based solely upon his confessions; that the trial was conducted in Schoolcraft County instead of Alger County where the crime, if committed at all, was committed; and the incompetence and unfaithfulness of his state-appointed defense counsel. The Michigan Supreme Court held that Lundberg's counsel had been neither incompetent nor unfaithful; that the question of the admissibility of the confessions could not be considered on appeal because no objection to their admissibility was made in the trial court; and that the venue of the trial was properly set in Schoolcraft County. A motion for rehearing was denied by the Supreme Court of Michigan March 15, 1962.

Lundberg's motion for leave to file a petition for writ of habeas corpus was treated as a petition for writ of certiorari and denied by the Supreme Court of the United States February 19, 1962. 368 U.S. 983, 82 S.Ct. 635, 7 L.Ed.2d 546.

In support of his application for writ of habeas corpus in the District Court and his appeal to this court, petitioner asserts that his federal constitutional due process rights have been violated by the admission of coerced and involuntary

confessions made during a period of illegal detention and by the introduction of evidence obtained by illegal search and seizure. Respondent contends that these questions cannot be considered here because they were not raised in the state trial court. The record shows that the admissibility of the testimony of the officers concerning Lundberg's oral confessions was not questioned by petitioner in his state court trial; and further that Lundberg's written confession was introduced as evidence for the defense in an effort to prove the absence of premeditation. No search and seizure question was raised in the state trial court or before the Supreme Court of Michigan.

For the purposes of this appeal and under the facts and circumstances of this case, we pretermit the question of whether these issues now can be raised by petitioner, and proceed, as did the District Court, to consider these federal constitutional questions as fully as if they had been raised in the state trial court.

The District Judge, the Honorable W. Wallace Kent, conducted hearings on two separate days. After appointing counsel to represent petitioner, Judge Kent continued the hearing from January 19, 1963, until August 8, 1963, in order to allow sufficient time for preparation. Witnesses were subpoenaed at petitioner's request but were not placed on the stand. Instead, petitioner relied only upon the transcript of his state court trial, offering no new evidence on his behalf. Both Lundberg and his court-appointed counsel made lengthy arguments before the District Judge. This court has read the entire transcript of the state court trial proceedings and agrees with the District Court and with the Supreme Court of Michigan, 364 Mich. 596, 111 N.W.2d 809, that petitioner was accorded a fair trial and that he has not been deprived of any constitutional rights.

On the question of the voluntariness of the confessions, the "true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort." Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, quoting from Wilson v. United States, 162 U.S. 613, 623, 16 S.Ct. 895, 40 L.Ed. 1090. The "question in each case is whether the defendant's will was overborne at the time he confessed." Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922.

As said in Culombe v. Connecticut, 367 U.S. 568, 578–580, 586–587, 81 S.Ct. 1860, 6 L.Ed.2d 1037:

" 'Questioning suspects is indispensable in law enforcement.' As the Supreme Court of New Jersey put it recently: 'the public interest requires that interrogation, and that at a police station, not completely be forbidden, so long as it is conducted fairly, reasonably, within proper limits and with full regard to the rights of those being questioned.' But if it is once admitted that questioning of suspects is permissible, whatever reasonable means are needed to make the questioning effective must also be conceded to the police. Often prolongation of the interrogation period will be essential, so that a suspect's story can be checked and, if it proves untrue, he can be confronted with the lie; if true, released without charge." 367 U.S. at 578–580, 81 S.Ct. at 1865–1866.

\* \* \* \* \* \*

"But because it is the courts which are charged, in the ultimate, both with the enforcement of the criminal law and with safeguarding the criminal defendant's rights to procedures consistent with fundamental fairness, the problem of reconciling society's need for police interrogation with society's need for protection from the possible abuses of police interrogation decisively devolves upon the courts, particularly in connection with the rules of evidence which regulate the admissibility of extrajudicial confessions." 367 U.S. at 586–587, 81 S.Ct. at 1870.

■ We agree with the findings of Judge Kent that there is no evidence to support Lundberg's contention that his confessions were involuntary. Petitioner has never said and does not now say that any threats were made against him, or that any inducement was offered him to make the statements, or that the officers struck him or subjected him to any physical mistreatment or abuse, or deprived him of food, refreshments or sleep. There is no showing that he was sick or that he was questioned to the point of physical exhaustion. The record indicates that he went to sleep at about 2:45 Wednesday night and was not disturbed until about nine o'clock in the morning. The periods of interrogation were not of long duration and there were a number of interruptions. Approximately ten hours elapsed from the time Lundberg was picked up and the time he stated to the officers, at between 8:00 and 8:30 in the evening, that he would tell them what they wanted to know, after he had given two false statements as to the cause of the blood on his car. During this period the two officers traveled approximately forty-four miles from Marquette to Munising and back and made an unsuccessful search of the city dump for the missing floor mats. Questioning was discontinued altogether while the officers located, interviewed and obtained a written statement from the woman upon whom Lundberg claimed to have performed an abortion.

There is nothing in the record to indicate that petitioner did not know what he was doing when he proposed to take the officers to the body of his victim upon condition that he not be required to look at her.

This case does not involve an inexperienced first offender. Petitioner is a mature man with much previous experience with police, having spent time in prison on at least three occasions. He told the prosecutor that he had studied law for quite a few years and had filed briefs in the Supreme Court. His familiarity with the criminal law is confirmed by the briefs he has filed on his own behalf in

this case. While the prosecutor was explaining to him his constitutional and statutory rights on the occasion of his hearing before the magistrate, Lundberg twice interrupted saying: "I know what the law is." He was quick to recognize that a serious legal question existed as to which county had venue of his trial, and changed his story as to the place where his automobile was parked at the time Miss Burdick was killed in an effort to establish that venue was not in Schoolcraft County. He seized upon the defense of absence of proof of premeditation and wrote out and signed a confession contradicting his oral confessions in an effort to bolster that defense. He feigned a suicide attempt while in jail in an effort to lay a basis for pleading insanity, later admitting that the suicide attempt was a "phony."

There is nothing to indicate that Lundberg was afraid of the officers or that they overpersuaded him. He does not say that he requested and was denied the right to consult a lawyer or to communicate with members of his family.

We concur with the finding of the District Court that an examination of the totality of all the circumstances does not establish that Lundberg's statements were made other than voluntarily.

■ Petitioner contends that he was subjected to examination for too many hours before being taken before a magistrate. Although not offering any evidence to show that the officers coerced him into making an involuntary confession, he argues that the delay in taking him before the magistrate for hearing renders his confessions involuntary as a matter of law. The record shows that he was picked up about 10:30 Wednesday April 25 and was taken before a magistrate on the following day, Thursday afternoon April 26. Interrogation was by no means continuous nor was it of the extended and coercive type of questioning which so often has been held to have violated the constitutional rights of defendants. The delay in arraignment was due, at least in part, to the long distances over which the officers found it necessary

to travel; to the uncertainty whether the crime was committed in Alger County or Schoolcraft County, resulting in involvement with the coroners and county prosecutors of both counties; and to the time required to investigate Lundberg's alibis concerning the deer and the alleged abortion. It was not until 11:00 p. m. on Wednesday that the body was found, at a time when the officers were of the impression that the death occurred in Alger County. Lundberg was kept up until after midnight, not for continuous questioning, but because of the necessity of sending for a map to determine venue of the crime, and then transporting him and the body of his victim to Schoolcraft County. Interrogation by the county prosecutor on Wednesday night lasted only from fifteen to twenty minutes. Lundberg was not interrogated further until the middle of the following morning, and then only briefly. He was taken before the magistrate that afternoon, following the completion of the autopsy on the body of his victim.

■ Petitioner relies upon 28 M.S.A. 28.872, Comp.Laws 1948, § 764.13, which requires that peace officers who arrest a person without a warrant must "without unnecessary delay" take the person arrested before the most convenient magistrate of the county in which the offense was committed, and upon 28 M.S.A. 28.885, Comp.Laws, 1948, § 764.26, which directs that every person charged with a felony shall be taken before a magistrate "without unnecessary delay." Quite obviously it was not feasible to take Lundberg before "the most convenient magistrate in the county where the offense was committed" until the officers had determined that the crime occurred in Schoolcraft County. This fact was not established until after midnight Wednesday night. Even if it be concluded that there was an unnecessary delay in not taking Lundberg before a magistrate until after the autopsy was completed, a delay in arraignment in violation of a state statute does not make a confession made during such period of illegal detention necessarily inadmissible in a prosecution in state courts, but is merely a factor to be considered in determining voluntariness. Allen v. Bannan, 332 F.2d 399 (C.A.6).

■ Petitioner asserts that there was no evidence of premeditation other than the testimony of the officers as to his oral confessions. It seems to be well settled under the case law of Michigan that wilfulness, deliberation and premeditation may be logically inferred from the character of the weapon used, the wounds inflicted upon vital parts and the circumstances surrounding the killing. People v. Bauman, 332 Mich. 198, 50 N.W.2d 757; People v. Vinunzo, 212 Mich. 472, 180 N.W. 502; People v. Jackzo, 206 Mich. 183, 172 N.W. 557; People v. Wolf, 95 Mich. 625, 55 N.W. 357; People v. Potter, 5 Mich. 1, 71 Am.Dec. 763.

■ On the search and seizure issue, we find no evidence of an unlawful search. The blood on the outside and inside of Lundberg's automobile was visible from outside the car, and it was not necessary to break into the vehicle to see it. "It is not a search to observe that which occurs openly in a public place and which is fully disclosed to visual observation." United States v. Williams, 314 F.2d 795, 798 (C.A.6).

The floor mats were later found at the point where Lundberg had discarded them, and were not taken by breaking into the vehicle. Material from the front seat of the automobile was sent to the state laboratory for testing prior to the trial, along with some of petitioner's clothing, but there is no evidence as to whether or not this was obtained by the use of a search warrant. The record also indicates that the officers later removed a towel set, fishing equipment and pistol shells from the trunk of the car and shells from his hotel room, but there is no evidence as to whether or not these items were obtained through search warrant or otherwise. Further, these latter items were not related to the crime of which petitioner was convicted. People v. Lundberg, 364 Mich. 596, 111 N.W.2d 809, supra.

The court expresses appreciation to Mr. Thomas D. Heekin of the Cincinnati

bar, who made an excellent oral argument before this court and prepared a most helpful and able brief as court-appointed attorney for appellant.

Affirmed.